UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| ) | |
| v. ) | CRIMINAL NO. 2:17-CR-100-DBH |
| ) | |
| YARLIN GARCIA AND ) | |
| LUIS ROSARIO-DIAZ, ) | |
| ) | |
| DEFENDANTS ) | |

DECISION AND ORDER ON MOTION TO SUPPRESS

On March 14, 2018, I conducted an evidentiary hearing on the defendants' motion to suppress. On March 27, 2018, I heard oral argument on the motion. There is really no dispute about the underlying facts, although the parties disagree over their significance and what conclusions I should draw. Based on the hearing and the arguments, I make the following factual findings, and **DENY** the motion to suppress.

FACTS

In June of 2017, MDEA Special Agent Carleton had been surveilling a target—someone he had arrested a year earlier for drug trafficking who was released on bail and was under suspicion of additional trafficking. Carleton tailed the target to Nason Street in Sanford, Maine on June 8 for what Carleton believed to be a drug pickup.

On June 19, Carleton arrested him.  The target had in his possession 4 fingers (c. 40 grams) of heroin.[1]  After consulting his lawyer, the target agreed to cooperate.  I shall call him CD1 (for "cooperating defendant").  CD1 gave Carleton a physical description of his source for drugs, told him where the source lived, the source's first name, and a description of his vehicle.  CD1 confirmed that the June 8 trip Carleton had observed was in fact to pick up 200 grams of heroin from the source on Nason Street, Sanford.  He told Carleton that within the previous months he had observed substantial quantities of heroin and cocaine at the Nason Street address.  He consented to Carleton viewing his cellphone and identified his source as "Connect" on the cellphone.  He also told Carleton that he believed Connect's source of supply was a Hispanic male from Massachusetts.  Carleton photographed the cellphone screen showing text messages between CD1 and Connect on June 19, admitted as Exhibit 1A.  In one message, Connect said "Ya only hv like 5 could spare right now hopefully tomorrow be good."  CD1 said that meant Connect had 5 fingers of heroin or about 50 grams, but was hopeful he would have more the next day that he could sell to CD1.

Agents obtained a search warrant for the source's Nason Street premises from a state judge.  On June 20, surveillance of the Nason Street residence started around lunchtime.  Task Force Officer Lapierre was part of that surveillance team.  Meanwhile, Carleton instructed CD1 to try to arrange a transaction with Connect.  (CD1 was in custody at Cumberland County Jail, and

---

[1] Agent Carleton used the term "heroin fentanyl."  I am aware that heroin is sometimes or often laced or mixed with fentanyl, and apparently the substance the defendants seek to suppress here is such a mixture.  However, I will generally refer to the substances in this case as heroin.

Carleton worked with him in the Sheriff's Office.)  Carleton listened to CD1's phone calls and photographed the texts between CD1 and Connect.  The texts were admitted into evidence as Exhibits 1B through 1I.  In response to a text from CD1 inquiring whether Connect was "good For 25 instead," followed by another text "If not 20 is cool.  Just going through shit quick," Connect responded "Ya if he gets here in time," Ex. 1F, 1G, and later, "Only hv couple fing[ers] if he don't show up."  Ex. 1H.  Another text said that Connect's source was "on way from Connecticut."  Ex. 1E.  During one of the phone calls, Connect referred to the transaction between Connect and his source as for "30 grand."

      Seeing a vehicle with Massachusetts plates arrive at Connect's residence in Sanford late in the evening of June 20 and an individual go inside the residence, agents executed the state warrant, believing that Connect's source had arrived.  They quickly learned that it was only a teenager who had come to play video games with another teenager on the premises.  But they detained Connect and he in turn agreed to cooperate.  I shall refer to him as CD2.  Law enforcement had no previous dealings with CD2.  CD2 told Task Force Officer Lapierre that he had placed a large order that was going to be delivered to his house from an out of state source, that the source was close by, arriving in 10 minutes, that CD2 had the money for the transaction, that his source's vehicle would pull into the driveway or park immediately in front of the house, that the drugs would be concealed in the engine compartment, usually in an air vent or air intake, and that previously his source used a "a dark colored SUV possibly a

Jeep."[2]  There was no evidence that CD2 identified the state of registration for the vehicle his source had driven in the past.

Realizing that CD2's source had not arrived but that his arrival was imminent, law enforcement did not have time to search or even secure the premises, but Maine State Trooper Adam Schmidt did observe heroin fingers in plain view.  Law enforcement then promptly removed their marked vehicles and left the premises or hid.  It was now around 11 p.m.  Lapierre stayed in the basement with CD2.  Much of their interaction was recorded and admitted in evidence as Exhibit 2.  CD2 also gave Lapierre access to his cellphone and gave him the password, and Lapierre accessed previous texts between CD2 and his source, whom CD2 identified as "B Man" in the texts.  The texts were admitted into evidence as Exhibit 3.  The last text message, which CD2 received within 15-20 minutes before Lapierre saw it, referred to 30,850, *i.e.*, a number consistent with the "30 grand" Carleton had heard Connect mention as the size of the impending transaction in a phone call between CD1 and Connect/CD2.  At Lapierre's instructions, CD2 phoned his source using the speakerphone function.  Lapierre saw that CD2's source's cellphone area code was New Hampshire, but CD2 told him that the source was not from New Hampshire but from somewhere around Lawrence, Massachusetts.  Lapierre listened to the call on the speakerphone.  The source said that he was on the "long road"—which

---

[2] On his direct examination, Lapierre testified that CD2 said his source used a gray or silver Jeep.  But on cross-examination he agreed that CD2 had described the vehicle as a dark colored SUV or Jeep.  MDEA Special Agent McDonald testified that agents were told it was a black SUV.

CD2 identified as Route 202, a back route from Massachusetts through New Hampshire that avoided the interstate—and that he was 10 minutes away.[3]

Soon and within the 10 minutes, B Man called CD2 to say that he was right outside and that CD2 needed to move the red car at the end of the driveway. Lapierre had observed previously that a red car was parked at the end of the driveway. CD2 told Lapierre "They're here. They right f***in' out front." Ex. 2. At the time, law enforcement observed a silver Dodge pickup, which had come down Nason Street from the direction of Route 202, stop briefly in front of the house, and then proceed in the direction of Main Street. A few minutes later, it returned in the opposite direction and stopped directly in front of the house, but still on the public street, adjacent to the curb. During this short sequence of events, CD2 told Lapierre that his source had on occasion used a Dodge truck or silver truck to deliver the drugs, and that this was he.

Lapierre proceeded to order the seizure of the vehicle and its occupants.

Maine State Trooper Adam Schmidt was part of the surveillance team. He was present both to conduct any necessary traffic stop and, as a qualified K9 handler with his dog Ibo, to conduct a sniff for drugs. After leaving the house upon discovering that the source had not yet arrived when the state search warrant was initially executed, Schmidt stationed his marked cruiser on a side street, out of sight. When he received word to conduct the stop, he activated his dash camera. The first 30 minutes or so of the resulting video, introduced into evidence as Exhibit 8, show the takedown and the dog sniff.

---

[3] The recording shows that Lapierre reported to the other agents waiting for the takedown "Ten minutes. He says he's on the long road, so he's thinking Route 202 . . . he's saying it's gonna be, under the, under the hood." Ex. 2.

There were about 10 agents, all armed with guns drawn. The agents were shouting as the stop occurred.

Trooper Schmidt approached the driver's side, ordered the driver (the defendant Rosario-Diaz) out of the vehicle and, when he did not immediately get out, pulled him out and in Schmidt's words "guided him to the ground." The defendant's lawyer had argued in his legal memorandum that the defendant was "forcibly removed and thrown to the ground," but there was no testimony to that effect, only the Trooper's testimony just quoted. The video shows that Schmidt did forcibly pull Rosario-Diaz out and onto the ground, but it does not show violence or excessive force. It shows Schmidt cuffing Rosario-Diaz, patting him for weapons while he was on the ground, telling him to relax, and finally helping Rosario-Diaz get to his feet. Schmidt told Rosario-Diaz that he was detained but did not give him Miranda warnings.

MDEA Special Agent McDonald detained the passenger in the front seat (the defendant Garcia), told him he was detained and gave him Miranda warnings. Garcia declined to talk. McDonald then turned his attention to Rosario-Diaz,[4] gave him Miranda warnings, and Rosario-Diaz agreed to talk. The interview was recorded and introduced into evidence as Exhibit 7.

About 17 minutes after Trooper Schmidt's dash cam was activated,[5] and while Agent McDonald was interviewing the defendant Rosario-Diaz, Trooper

---

[4] There was a passenger in the back seat of the vehicle, but he/she was not identified to the court and he/she was not charged.
[5] By my reckoning, the trooper's car starts moving at about 35 seconds into the video; the stop occurs at about 1 minute; and the dog sniff begins at about 17 minutes and 20 seconds into the video.

Schmidt had his K9 Ibo execute a drug sniff of the vehicle exterior. Ibo alerted to the presence of drugs near the front of the vehicle, consistent with CD2's statement that they were usually hidden under the hood near the air intake.[6] Agents raised the hood and discovered large quantities of a heroin/fentanyl mixture and cocaine.

The vehicle containing the drugs was a rental car from Massachusetts, but had Maine registration plates. The hearing did not reveal when law enforcement noticed the Maine plates, but I assume it was immediately (just as they noticed the Massachusetts plates of the vehicle when the innocent teenager arrived earlier).[7] The rental agreement and bill were admitted as Exhibit 10. Neither defendant was the renter (there was no evidence of the identity of the renter aside from the agreement itself), neither defendant was an authorized driver under the rental contract, and the rental contract was only for June 12-13, not extending to June 20. The bill shows that the rental was returned on June 27.

The defendants have moved to suppress the drugs, a cellphone discovered in the vehicle, and Rosario-Diaz's statements to Agent McDonald.

The government responds that the defendants have no standing, that the agents had probable cause to seize the vehicle and search its contents, that the state search warrant separately gave them that authority, that at the very least they had authority to conduct a <u>Terry</u> stop and a dog sniff, that Rosario-Diaz was properly Mirandized, and that therefore nothing should be suppressed.

---

[6] There was no challenge to the dog and handler's training, credentials, or procedures.
[7] Lapierre who was orchestrating events from the basement with CD2 did not learn of the Maine plates until "after everything had been taken down." It is not clear what he meant by that.

7

**ANALYSIS**

*Search Warrant*

First, I reject the government's argument that the state search warrant granted authority to stop and search this vehicle and its occupants. That warrant granted authority to search:

> Any/all persons present *on the premises* of [address] Nason Street in Sanford, ME 04073 at the time of execution of this search warrant *or arriving at the residence or premises during the execution of this search warrant* activities [sic] or unrelated residents of that building. Including if necessary strip searches of those individuals except persons present or arriving in the course o[f] their regular legitimate business.

Ex. 5 (emphasis added). The government maintains that the Dodge pickup and its occupants "arriv[ed] at the residence or premises during the execution of this search warrant" within the scope of the authorized search. That is an unreasonable reading of the warrant. That reading would justify search of the occupants of any vehicle on the public road that stopped in front of the house.[8] The search warrant application given to the state judge did not provide probable cause for such a wide scope.

I observe that the warrant was directed first at "persons present on the premises." The addition of those "arriving at" is reasonably interpreted as meaning those persons who came onto the premises during the execution of the warrant. That never happened here. These defendants remained inside their

---

[8] The warrant's carve-out for persons "present or arriving in the course o[f] their regular legitimate business" is not a meaningful check on this overbreadth. Anyone not obviously a mail carrier or delivery person would likely end up detained and searched before law enforcement could determine whether that person's business at the scene was legitimate. It is also not clear from the warrant's language that the carve-out applies to all searches under this warrant provision or just to strip searches.

8

vehicle on a public street until the agents forcibly removed them. Moreover, the warrant's quoted language on which the government relies as permitting a search does not even extend to the vehicle, only the persons of those arriving.[9]

### *Standing*

The Supreme Court has under review a circuit split over standing to object to a search of a rental car by a driver not named in the rental agreement. United States v. Byrd, 679 F. App'x 146 (3d Cir.), cert. granted, 138 S. Ct. 54 (2017). But I need not decide that issue. It is clear that both a driver and passenger have standing to object to a *seizure, i.e.,* the stop of the car and their persons, as occurred here. Brendlin v. California, 551 U.S. 249 (2007). The defendants are arguing that the drugs discovered under the hood should be suppressed because they are "fruit of the poisonous tree" of the allegedly unconstitutional seizure of the vehicle and their persons during the takedown. In that respect, standing is needed as to the constitutional violation, not as to the evidence derived from that violation, United States v. Olivares-Rangel, 458 F.3d 1104, 1117 (10th Cir. 2006), and these defendants have that standing.

### *Probable Cause*

I am satisfied, however, that law enforcement had probable cause to stop and search the vehicle and to arrest[10] the two defendants once it parked in front of the house. "Probable cause exists when the facts and circumstances as to

---

[9] I need not decide whether the rule announced in Michigan v. Summers, 452 U.S. 692 (1981), permitting law enforcement to *detain* an occupant of premises for which they have a search warrant while the warrant is executed, extends to these two defendants who were *not* occupants of the premises. As appears below, I conclude that there was probable cause to stop and search the vehicle and arrest its driver and passengers.

[10] Even though the officers referred to it as detention rather than arrest until the dog sniff alerted them to the presence of narcotics.

9

which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found. . . . [A]ll that is required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act." United States v. Dion, 859 F.3d 114, 131-32 (1st Cir. 2017) (citations and quotations omitted). That "fair probability" was present here. Law enforcement officers were observing a major drug distribution transaction as it unfolded in real time, seeing and hearing the messages of the out of state source as he traveled to and arrived at Nason Street in Sanford Maine.

The defendants nevertheless challenge probable cause, pointing to the following:

1. Law enforcement showed no evidence of the reliability of the two cooperating defendants or knowledge of their criminal history. They had never previously worked with CD2.

2. As events unfolded, the agents first were told that the source probably came from Connecticut, then saw a New Hampshire area code for cellphone calls made to him, then were told he was from Massachusetts, but ultimately stopped a vehicle with Maine plates.

3. They were told to expect a dark-colored SUV, but this was a silver pickup.

I deal with the challenges in the same sequence.

The use of informant information to support probable cause depends upon the "totality-of-the circumstances approach." Illinois v. Gates, 462 U.S. 213, 230 (1983). I will therefore look at all the circumstances surrounding the information

10

provided by CD1 and CD2.  I observe first, however, that this is not the conventional informant case where someone, perhaps anonymously, alerts law enforcement to illegal activity.  Here, Agent Carleton was familiar with CD1's involvement in drug trafficking.  More important, Carleton caught CD1 in the midst of a crime and CD1 was striving for favorable treatment through cooperation and was making statements against his penal interest.  What CD1 did thereafter, he did at Carleton's instruction.  As a result, Carleton himself heard and observed CD2's willingness to engage in a substantial drug transaction with CD1.  Carleton did not need any other past experience with CD1 or knowledge of his criminal history to assess the veracity and reliability of what was being said and happening before him in real time.[11]  As the court recognized in United States v. Vongkaysone, 434 F.3d 68, 74-75 (1st Cir. 2006), statements against interest, the desire for leniency (which will occur only with accuracy), and corroboration, all can bolster credibility.

      The same is true for CD2.  Executing a state search warrant, law enforcement detained him in a house already identified by CD1 as his source.  Law enforcement had observed CD1 go to that house previously for drugs.  Heroin was in plain view in the house.  CD2 agreed to cooperate, hoping for leniency, and made statements against interest and statements that unfolding events corroborated.  He showed Lapierre the texts between him and his source and let Lapierre listen to the calls; identified where the source typically hid the drugs in the source's vehicle; and told Lapierre that the source liked to park in

---

[11] I would have to indulge an assumption of an elaborate, pre-arranged setup to discount the significance of what Carleton saw and heard.

11

his driveway or out front. Agent Lapierre listened to a speakerphone phone call with CD2's source, observed texts between them and listened to one end of a nonspeakerphone call. He learned from the texts that a very large transaction (at least $30,000 according to what Lapierre viewed in CD2's texts and confirmed with him orally, Ex. 2; more precisely, $30,850 according to a text from B Man to CD2 at 10:32 pm, Ex. 3), with an out of state source was imminent. The timing of the defendants' arrival was entirely consistent with the information law enforcement had obtained. There were no other eligible vehicles in the vicinity. The source's request over the phone when he arrived that a red car at the end of the driveway be moved corroborated previous information. Under any reasonable view, law enforcement had every ground to believe that a large shipment of drugs had just arrived outside the house on Nason Street in Sanford when the silver pickup pulled up and stopped directly in front of the house and the phone call came in to move the red car at the end of the driveway. The fact that law enforcement had never previously worked with CD2 does not eliminate probable cause given the specificity of CD2's information, his incentives to be accurate, and the corroboration of events.[12]

Any confusion over where the source lived or obtained his drugs does not diminish the probable cause. CD1 had given only a very vague reference to

---

[12] Analogously, in United States v. Favreau, __ F.3d __, 2018 WL 1444328, at *1 n.1 (1st Cir. 2018), in dealing with reliability of information from a tipster and the reasonableness of crediting the tip, Justice Souter said for the court:
> [O]wing to the synergy of the content of the tip and the facts that unfolded prior to and during the stop of [the defendant's] car, reliability ex ante is not a significant question here. The content of the tip was significant in making sense of the other facts recited below, which themselves suggested that the tip might well be true; all, together, had a degree of coherence that raised a reasonable suspicion of wrongdoing, which in turn justified the dog sniff that provided the further fact sufficient for probable cause to search the car.

Connecticut and CD2's text said only that the source was "on way from Connecticut" in the context of arrival time, not that he lived there; a New Hampshire area code on a cellphone does not establish residency in today's world; CD2 was firm in attributing his source to the Lawrence, Massachusetts area. The source's reference to the "long road" and his direction of travel were also consistent. Given the arrival of the vehicle as predicted, and the request to move the red car, the presence of Maine registration plates on the vehicle does not diminish probable cause.[13]

The model and color of the vehicle that arrived were not consistent with CD2's original description of the vehicle his source had used in the past. But CD2 never said what vehicle would arrive on June 20, and when he learned what vehicle had in fact arrived, CD2 said that in the past his source had used a silver pickup. Under the pressure of the circumstances there was no reason for him to prevaricate. In other words, if law enforcement stopped and searched this vehicle upon his advice only to determine that it was the wrong vehicle, that would hardly help CD2. In any case, "an informant's statements need not be fully corroborated for an officer to conclude that they are generally reliable." Vongkaysone, 434 F.3d at 74 (first-time informant operating at behest of law enforcement provided mostly accurate details about how the drug deal would unfold, corroborated in real time by law enforcement, but was wrong about the make and color of the supplier's car; probable cause existed nevertheless to

---

[13] As I said earlier, the evidence does not reveal when the agents noticed the Maine registration plates. I assume they did not know at the time that this was a rental vehicle. If they had known that, it would be an additional reason to ignore the state shown on the registration plates.

arrest the supplier). The model and color of the arriving vehicle do not undermine probable cause here.[14]

I conclude that at the time of the takedown, law enforcement had probable cause to stop the vehicle, search it, and arrest the occupants even without the subsequent dog sniff. See Dion, 859 F.3d at 131 (probable cause needed for automobile exception to warrant requirement); United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987) (probable cause needed for warrantless arrest). There is therefore no "fruit of the poisonous tree" to suppress.

***Terry Stop***

If I am incorrect on probable cause, there was certainly enough for a Terry stop on the reasonable and articulable suspicion standard. United States v. Chhien, 266 F.3d 1, 5-6 (1st Cir. 2001). Dog sniffs during a lawful stop do not implicate legitimate privacy interests. Illinois v. Caballes, 543 U.S. 405, 409 (2005). Police cannot *extend* a completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff, Rodriguez v. United States, 135 S. Ct. 1609, 1614-15 (2015), but here they did have reasonable suspicion and the dog was on the scene and part of the processing of the stop. Suppression of the drugs discovered in the vehicle is therefore denied for this alternative reason.

---

[14] Based on the cross-examination of Lapierre, I thought initially that the defendants were also challenging probable cause because Lapierre did not identify either defendant's voice as the voice he heard earlier on the speakerphone call. As it turns out, they did not make that argument in their legal memoranda or at the oral argument. In any event, Lapierre testified that although he heard the source's voice during one call over the speaker function of the cellphone with CD2, he did not feel comfortable enough to compare the voices that he heard later from the detained defendants. Moreover, his hearing of their voices occurred after the stop and is therefore not relevant to my probable cause determination. Finally, Lapierre did not testify that the voices were inconsistent, only that he could not be comfortable making an identification given the limited circumstances of the cell phone call, which the recording shows to have lasted less than thirty seconds.

*Rosario-Diaz's Statements*

Because there was probable cause to arrest Rosario-Diaz and because he received <u>Miranda</u> warnings, there is no basis to suppress his statements to Agent McDonald. The circumstances of his forcible removal from the car and to the ground are not enough to exclude them, although perhaps a jury will consider those circumstances in assessing what he said. <u>See</u> <u>United States v. Feliz</u>, 794 F.3d 123, 130-31 (1st Cir. 2015) ("[T]he defendant generally retains the freedom to 'familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness.' That is so because the jury is empowered to 'assess the truthfulness of confessions'—their credibility—as part of their decision on 'the ultimate factual issue of the defendant's guilt or innocence.'") (citations omitted).

## CONCLUSION

For these reasons, the defendants' motion to suppress is **DENIED**.

**SO ORDERED.**

**DATED THIS 28TH DAY OF MARCH, 2018**

/S/ D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**